UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| FERNANDO CABRAL-VARELA,<br><br>    Petitioner,<br><br>v.<br><br>MICHAEL RODRIGUES,<br><br>    Respondent. | )<br>)<br>)<br>)<br>)<br>)    Civil No. 20-11073-LTS<br>)<br>)<br>)<br>)<br>) |

MEMORANDUM AND ORDER ON HABEAS PETITION (DOC. NO. 1)

December 2, 2020

SOROKIN, J.

Fernando Cabral-Varela, an inmate at the Massachusetts Correctional Institution in

Concord, Massachusetts, has filed a petition for a writ of habeas corpus pursuant to 28 U.S.C.

§ 2254.  He asserts a single federal claim: a challenge to the partial closure of the courtroom

during a portion of his trial in state court.  Doc. No. 1 at 5; Doc. No. 2 at 3-12.[1]  Because Cabral-

Varela has not satisfied the stringent standards governing federal habeas review, his petition is

DENIED.

I.      BACKGROUND

On December 19, 2016, after a six-day trial, a Suffolk County jury convicted Cabral-

Varela of armed assault with intent to murder, assault and battery with a firearm, and related

firearms offenses.  Doc. No. 1 at 1-2; Doc. Nos. 17-1, 17-2, 17-3, 17-4, 17-5, 17-6;

Commonwealth v. Cabral-Varela, 124 N.E.3d 158, 2019 WL 1077171, at *1 (Mass. App. Ct.

---

[1] Citations to items appearing on the Court's electronic docket ("Doc. No. __ at __") reference
the document and page numbers assigned by ECF.

Mar. 7, 2019) (unpublished).  The charges arose from an August 13, 2015 shooting in Boston's

Dorchester neighborhood.  The trial witnesses included four civilians who lived on the block

where the shooting occurred and saw some or all of the relevant events.  Other residents of the

block included Cabral-Varela's girlfriend and at least two of his close friends.  From the start of

the investigation into the shooting and continuing throughout the trial, "[w]itness intimidation

was a serious concern."  Cabral-Varela, 2019 WL 1077171, at *1.

In a pretrial motion seeking additional security measures, the prosecutor identified

seventeen incidents giving rise to substantial concerns regarding the potential for witness

intimidation and the need for enhanced security during the trial.  Doc. No. 18 at 5-9; Cabral-

Varela, 2019 WL 1077171, at *1.  The trial judge allowed the motion and required all trial

spectators to show identification and sign in upon arrival at the courtroom.  Doc. No. 17-1 at 4.

The events that formed the basis for the motion, and for the trial judge's ruling, included

numerous expressions of fear by potential witnesses to law enforcement officers investigating the

shooting and multiple recorded telephone calls between Cabral-Varela (in jail) and his girlfriend

that the prosecutor thought suggested efforts to manipulate or influence witness testimony.  Doc.

No. 18 at 5-9; see Cabral-Varela, 2019 WL 1077171, at *1 (citing "several instances of alleged

witness intimidation by the defendant and his associates . . . and witnesses' reticence to

cooperate with the investigation due to their 'fear of involvement in the trial'").

During a morning break on the first day of testimony, the trial judge learned that one of

Cabral-Varela's associates had been in the hallway outside the courtroom speaking with people

connected to the case—and that this conduct appeared to violate the terms of probation the

individual was serving after a conviction for interfering with the police investigation of the

shooting Cabral-Varela was charged with committing.  Doc. No. 17-2 at 101-04.  The trial judge

barred that individual from being present on the floor of the courthouse where Cabral-Varela's trial was being held.  Id.  Later the same day, the trial judge notified the parties that the victim's father, who was present as a potential witness for the Commonwealth, had expressed concern to a court officer about a group of people who were congregating in the hallway outside the courtroom.[2]  Id. at 172-78.  In response, the trial judge ordered that anyone in the hallway had to either show identification and enter the courtroom or leave, explaining that he was "not going to have people . . . chilling anyone seeking entrance into this courtroom."  Id. at 179.  The witness who began testifying that afternoon—a woman who had refused to comply with her summons and, thus, had been brought to court by police—"disclaimed any memory of the incident" despite having provided grand jury testimony describing her observations and identifying Cabral-Varela as the shooter.  Cabral-Varela, 2019 WL 1077171, at *1; see Doc. No. 17-2 at 198-247.

During a sidebar conference held at the start of the third day of testimony, the prosecutor informed the trial judge of three developments.  First, police officers had overheard Cabral-Varela's nephew, Wilson Mendes, speaking with a group of people when exiting the courtroom the previous day and referring to a witness as "a rat."  Doc. No. 17-4 at 3-5.  The witness had not heard the comment because "the prosecutor had escorted him out a different door to prevent him from being confronted."  Cabral-Varela, 2019 WL 1077171, at *1.  Second, the witness who had completed her testimony the previous morning after having been brought to the trial by police had asked to be relocated immediately after she testified because she "felt she could no longer safely return to her home."  Id.; see Doc. No. 17-4 at 6.  Third, the witness Mendes described as

---

[2] The concerns were conveyed in a note which read: "It's not cool with all of these guys here.  I can't do it.  It [sic] a lot of them."  Doc. No. 17-2 at 178.  The trial judge understood the note to mean that the witness was "feeling somewhat chilled or uncomfortable simply being present in the hallway."  Id.  The Commonwealth did not end up calling this witness at trial.

"a rat"—a man who had identified Cabral-Varela as the shooter in his testimony—had reported that a large group of young men were assembled at the house next to his when he returned from testifying at the trial, that they were staring at his home, and that this was "not normal."[3]  Cabral-Varela, 2019 WL 1077171, at *1.  The police posted a cruiser on the block in response to the witness's complaint.  Id.  Based on the first of these events, the prosecutor moved to bar Mendes from attending the remainder of the trial.  Doc. No. 17-4 at 4.

After hearing from Cabral-Varela's counsel, who objected to the request, and after learning of the second and third events described above, the trial judge allowed the prosecutor's motion, directing court officers to instruct Mendes to leave that floor of the courthouse if he appeared and sought entry during the remainder of the trial.  Id. at 18.  Six witnesses testified following the order excluding Mendes from attending as a spectator; he also was barred during closing arguments, jury instructions, and the return of the verdict.[4]  Cabral-Varela, 2019 WL 1077171, at *1; see generally Doc. Nos. 17-4, 17-5, 17-6.

On December 21, 2016, Cabral-Varela was sentenced to eighteen-to-twenty years' imprisonment.  Doc. No. 1 at 1; Doc. No. 17 at 15.  He filed a timely appeal.  Doc. No. 17 at 15.

In his appeal to the Massachusetts Appeals Court ("MAC"), Cabral-Varela advanced four challenges to his convictions: a violation of his Sixth Amendment right to a public trial arising from the exclusion of Mendes for the latter half of his trial, two errors regarding the admission of certain evidence by the trial judge, and one error in the trial judge's jury instructions.  Id. at 24-

---

[3] Cabral-Varela's trial was in mid-December.  See Doc. No. 17-4 at 13 (cancelling a view of the block where the shooting occurred because of "record cold" weather).  Cabral-Varela's girlfriend and another of his close friends lived in the relevant house.  See id. at 4 (describing the group as having congregated at 34 Norton Street); Doc. No. 17-2 at 70, 75-77 (identifying the residents of 34 Norton Street).
[4] The record does not reveal whether Mendes did, in fact, return and attempt to attend any of the trial after the judge ordered his exclusion.

26.  The MAC rejected each of Cabral-Varela's claims in an unpublished March 7, 2019

decision.  Cabral-Varela, 2019 WL 1077171, at *1-5.  Cabral-Varela petitioned for review by the

Supreme Judicial Court ("SJC"), Doc. No. 17 at 209-29, but the SJC demurred, Commonwealth

v. Cabral-Varela, 126 N.E.3d 88 (2019) (table).  He then sought certiorari in the United States

Supreme Court, Doc. No. 17 at 235-56, but that request was denied as well, Cabral-Varela v.

Massachusetts, 140 S. Ct. 409 (2019) (Mem.).

        In his submissions to both the SJC and the Supreme Court, Cabral-Varela advanced only

his Sixth Amendment challenge.  Doc. No. 17 at 210, 218-27, 236, 249-55.  He does the same in

his timely federal habeas petition.  Doc. No. 1 at 5; see generally Doc. No. 2.  The parties have

briefed the merits of Cabral-Varela's claim,[5] Doc. Nos. 22, 23, 24, and it is now ripe for

disposition.

II.    LEGAL STANDARDS

        State court decisions merit substantial deference.  A federal court may not grant a writ of

habeas corpus unless it finds that the state court's adjudication of the petitioner's claim

"(1) resulted in a decision that was contrary to, or involved an unreasonable application of,

clearly established Federal law, as determined by the Supreme Court of the United States[,] or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of

the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).  As the Supreme

Court repeatedly has emphasized, these standards are "difficult to meet," with the petitioner

carrying a heavy burden of proof.  Harrington v. Richter, 562 U.S. 86, 102 (2011); accord Cullen

v. Pinholster, 563 U.S. 170, 181 (2011); see Burt v. Titlow, 571 U.S. 12, 19-20 (2013)

---

[5] The respondent's filings in this matter present well-written, precise arguments.  The Court
commends the legal intern for assisting in the preparation of an excellent brief, and counsel for
the quality of her work as well as her unselfish sharing of credit.  Doc. No. 23 at 1.

(emphasizing "formidable barrier" faced by federal habeas petitioner where claims already were adjudicated in state court, and limiting relief to cases of "extreme malfunctions" by state criminal justice systems).

A state court ruling is "contrary to" clearly established Supreme Court precedent "if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases," or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [its] precedent." Williams v. Taylor, 529 U.S. 362, 405-06 (2000).  For a habeas petitioner to prevail under this exacting standard, the state court judgment must contradict clear holdings of the Supreme Court, not merely dicta in a Supreme Court decision nor law articulated by a lower federal court.  White v. Woodall, 572 U.S. 415, 419 (2014); see Knowles v. Mirzayance, 556 U.S. 111, 122 (2009). The Supreme Court has "repeatedly emphasized" that "circuit precedent does not constitute 'clearly established Federal law'" for purposes of § 2254(d)(1).  Glebe v. Frost, 574 U.S. 21, 24 (2014); accord Parker v. Matthews, 567 U.S. 37, 48-49 (2012).  It has also warned against using decisions of lower Courts of Appeals to "refine or sharpen a general principle of Supreme Court jurisprudence into a specific legal rule that [the Supreme] Court has not announced."  Marshall v. Rodgers, 569 U.S. 58, 64 (2013).

A state court decision constitutes an "unreasonable application" of Supreme Court precedent if it "identifies the correct governing legal rule . . . but unreasonably applies it to the facts of the particular state prisoner's case."  Williams, 529 U.S. at 407-08; accord Woodall, 572 U.S. at 425.  "The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations."  Yarborough v. Alvarado, 541 U.S. 652, 664 (2004).  "[I]f a habeas court must extend a rationale before it can apply to the facts at hand, then by definition

the rationale was not clearly established at the time of the state-court decision." Woodall, 472

U.S. at 426 (quotation marks omitted). "[R]elief is available under § 2254(d)(1)'s unreasonable-

application clause if, and only if, it is so obvious that a clearly established rule applies to a given

set of facts that there could be no 'fairminded disagreement' on the question." Id. at 427

(quoting Richter, 562 U.S. at 103).

A showing of clear error is not sufficient for a habeas petitioner to establish entitlement

to relief. Lockyer v. Andrade, 538 U.S. 63, 75-76 (2003); accord McCambridge v. Hall, 303

F.3d 24, 36-37 (1st Cir. 2002) (en banc). If a state court's decision "was reasonable, it cannot be

disturbed" on habeas review. Hardy v. Cross, 565 U.S. 65, 72 (2011) (per curiam); see Renico v.

Lett, 559 U.S. 766, 779 (2010) (admonishing federal habeas courts not to "second-guess the

reasonable decisions of state courts"). Relief is available only where a state court's

"determination was unreasonable – a substantially higher threshold." Schriro v. Landrigan, 550

U.S. 465, 473 (2007); Sanna v. Dipaolo, 265 F.3d 1, 13 (1st Cir. 2001) (explaining habeas relief

is appropriate only if a state court ruling is "so offensive to existing precedent, so devoid of

record support, or so arbitrary, as to indicate that it is outside the universe of plausible, credible

options" (quotation marks omitted)).

In assessing whether a state court's decision "was based on an unreasonable

determination of the facts in light of the evidence presented" to that court, § 2254(d)(2), "the

fundamental principle of deference to [a state court's] findings [of fact] still applies," Hensley v.

Roden, 755 F.3d 724, 731 (1st Cir. 2014). A federal habeas court "may not characterize

[challenged] state-court factual determinations as unreasonable merely because [it] would have

reached a different conclusion in the first instance." Brumfield v. Cain, 576 U.S. 305, 135 S. Ct.

2269, 2277 (2015) (quotation marks omitted). Rather, federal courts ordinarily must presume

that all of a state court's factual findings are correct, unless the petitioner has rebutted that presumption with clear and convincing evidence. § 2254(e)(1); Miller-El v. Cockrell, 537 U.S. 322, 340-41 (2003); see Teti v. Bender, 507 F.3d 50, 57-60 (1st Cir. 2007) (discussing the interplay between § 2254(d)(2) and § 2254(e)(1) and applying the presumption of correctness to the state court's "individual factfindings" after noting the reasonableness standard would govern an assessment of the state court's "final decision . . . on a determinative factual question").

III.   <u>DISCUSSION</u>

Cabral-Varela argues that the trial court's decision to exclude a single spectator from the courtroom during the second half of a six-day trial violated his constitutional right to a public trial. He urges that the MAC's rejection of this claim rested on an unreasonable determination of the facts and an unreasonable application of clearly established federal law. See generally Doc. Nos. 1, 2, 22, 24. Specifically, Cabral-Varela contends that the record provides no support for the MAC's determinations that Mendes presented a risk of intimidation as to nonpercipient witnesses, counsel, and the jury, as well as a risk to the general orderliness of the trial. Doc. No. 22 at 8-13. He further argues that the MAC unreasonably applied Supreme Court precedent concerning courtroom closures, especially insofar as the duration of the partial closure at issue is concerned. Id. at 14-16.

The MAC considered and rejected Cabral-Varela's Sixth Amendment claim on its merits. Cabral-Varela, 2019 WL 1077171, at *1-2. After recounting the relevant facts and noting it was assuming (but not deciding) "that Mendes's exclusion constituted a partial closure" of the proceedings, the MAC identified and applied a four-factor test to assess whether the closure had violated Cabral-Varela's right to a public trial. Id. Pursuant to that test, the partial closure of trial proceedings is permissible if: "(1) there is a substantial reason to justify the closure, (2) the

closure is no broader than necessary to protect that interest, (3) the judge considers reasonable alternatives to closing the proceeding, and (4) the judge makes findings adequate to support the closure." Id. at *2 (brackets and quotation marks omitted). The MAC then explained why Cabral-Varela's challenge failed when measured against this test:

> The first, third, and fourth factors are easily satisfied. Witness intimidation is an interest sufficiently substantial to justify a partial closure, and . . . it was a genuine cause for concern in this case. The judge also excluded Mendes to maintain order, noting that he would not "permit those sorts of comments to be made in the public areas of this court house and in a manner in which they may be overheard by others." The need to maintain order is also a sufficiently substantial interest to justify a partial closure. Next, the judge not only considered reasonable alternatives to excluding Mendes, but had already implemented one – the identification requirement – that had failed to address the concerns about intimidation and the need to maintain order adequately. Finally, the judge found that Mendes had [made the comments described by the prosecutor] and excluded him "[b]ased on that conduct and based on all of the circumstances surrounding the trial of this case and witnesses' expressions of fear leading up to their testimony in this case." These findings are adequate.

> [Cabral-Varela]'s principal argument, then, is that the closure was broader than necessary. Specifically, he argues that all of the concerns regarding witness intimidation related to the intimidation of the percipient witnesses, who were all members of a small community in Dorchester. According to [Cabral-Varela], there was no demonstrated risk that justified excluding Mendes for the testimony of the nonpercipient witnesses or the portions of the trial that followed the close of the evidence. Therefore, he argues, whatever substantial reason might have existed to justify Mendes's initial exclusion from the court room did not apply to these parts of the trial, and Mendes should have been allowed to observe them.

> We agree with [Cabral-Varela] that a closure can be broader than necessary if the substantial reasons that originally justified it cease to apply, but disagree that the substantial reasons ever ceased to apply in this case. To begin with, the trial judge reasonably could have found that Mendes's public comments evinced a substantial enough risk of intimidation with respect to the nonpercipient witnesses, counsel, and the jury to justify Mendes's exclusion for the rest of the trial. Furthermore, the trial judge evidently concluded that Mendes's outburst outside the court room created a substantial risk to the orderliness of the proceedings, and we see no error in this conclusion. The trial judge is permitted to act to protect the participants in a trial and the order of the court, and some measure of deference is owed to the trial judge's discretionary decisions in this regard. A judge need not wait for a witness to be intimidated,

the court room to be disrupted, or a specific threat before taking appropriate steps to address the risk of such misconduct.  The trial judge did not err by excluding Mendes for the rest of the trial.

Id. (citations omitted).

For present purposes, the Court will assume (as did the MAC) that the trial court's order barring Mendes from the last three days of the trial effected partial closure of the courtroom. The questions, then, are whether the MAC unreasonably determined the pertinent facts or unreasonably applied federal law—in particular, Waller v. Georgia, 467 U.S. 39 (1984)—in concluding that the partial closure did not violate Cabral-Varela's right to a public trial.  The record establishes the MAC's recitation of facts was supported by the proceedings in the trial court, and its analysis of the propriety of the partial closure was neither contrary to nor an unreasonable application of Waller or any other clearly established federal law.

Cabral-Varela identifies two aspects of the MAC's decision which he characterizes as unreasonable determinations of the facts:  1) that Mendes's hallway comments presented a risk of intimidation extending beyond percipient witnesses to other participants in the trial; and 2) that the trial judge also rested his closure decision on the need to protect the orderliness of the proceedings, and that reliance on such a concern was justified.  Doc.  No. 22 at 8-13.  This attempt to attack the factual basis of the MAC's decision in pursuit of relief under § 2254(d)(2) fails for at least two reasons.[6]

---

[6] Cabral-Varela urges that his challenges to the MAC's factual determinations should be reviewed under the reasonableness standard of § 2254(d)(2), rather than under § 2254(e)(1), which requires a presumption of correctness that can be overcome only with clear and convincing evidence.  Doc. No. 22 at 6-7.  The respondent disagrees, Doc. No. 23 at 8-10, and the law in this area remains unsettled, Teti, 507 F.3d at 57-58.  This Court will apply the standard Cabral-Varela proposes and need not wrestle with the manner in which the two standards interact, as resolution of Cabral-Varela's claim would be the same under either standard.

First, the two determinations Cabral-Varela challenges are not solely factual. Unlike findings that Mendes was heard referring to a witness as a "rat" and that six witnesses testified in his absence—which are purely factual matters and are not challenged here—the MAC's determinations that the trial judge did find, or reasonably could have found, that Mendes's conduct presented risks to trial participants in general or to the orderliness of the proceedings answered mixed questions of law and fact. Cabral-Varela attacks the manner in which the state courts applied the four-part legal test governing partial courtroom closures to the circumstances presented by his trial. Such determinations, however, are not reviewed under the provisions of § 2254 governing challenges to state-court fact finding, but under the "unreasonable application" standard of § 2254(d)(1). Yeboah-Sefah v. Ficco, 556 F.3d 53, 68 (1st Cir. 2009). Application of that standard to Cabral-Varela's claim leads to its denial for reasons explained below.

Second, even if the Court were to treat the challenged findings as strictly factual and assess them under § 2254(d)(2), it would find ample support for the MAC's determinations. For example, the record contains the following evidence, all of which demonstrates the MAC reasonably found that the trial judge was (rightly) concerned about maintaining orderliness throughout Cabral-Varela's trial, including when he barred Mendes from attending the latter half of it:

- The prosecutor's motion for additional security described the measures proposed as aimed at "maintaining order in the courtroom and protecting the integrity of the trial" by "preventing disruptions during the trial." Doc. No. 17 at 118.

- When allowing that motion, the trial judge recognized "a legitimate concern about potential . . . threats to retaliate against witnesses who in fact testify," and posited that the concern would become "greater . . . as witnesses testify." Doc. No. 17-1 at 4-5.

- On the first day of witness testimony, the trial judge twice addressed the propriety of individuals associated with Cabral-Varela congregating in the hallway outside the courtroom.  Doc. No. 17-2 at 101-04, 172-79.  The second time the issue arose, the judge stated that he would not "have people just hanging around for improper purposes," and that he did not want those in the hallway "chilling anyone seeking entrance into this courtroom."  Id. at 173, 179.

- On the fourth day of trial, while alerting the trial judge to developments that had arisen since the conclusion of the prior day's testimony, the prosecutor expressed concern regarding the effect Mendes's comment "would have upsetting the courtroom and the general nature of what's going on in this case."  Doc. No. 17-4 at 4.

- When the trial judge barred Mendes, he noted that Mendes's comment had been "overheard by police witnesses and was said to other observers of this trial."  Id. at 18.  Overruling a defense objection to his decision, the judge said he would neither "permit any witness to be intimidated with regard to their presence in the courthouse" nor "permit those sorts of comments to be made in the public areas of this courthouse and in a manner in which they may be overheard by others."  Id. at 19.

Given this context, the MAC reasonably found that the trial court's ruling barring Mendes was appropriately motivated by general concerns about maintaining order in the proceedings and preventing intimidating or threatening behavior that might impact anyone entering the courtroom.[7]

---

[7] It also bears noting that, as to the percipient witnesses who testified, the record is replete with indications that their fear did not abate when their testimony ended.  Multiple witnesses, upon completing their testimony, sought assistance relocating due to fear of returning to their homes on Norton Street.  Moreover, the trial court's concern for protecting actual or potential civilian witnesses might reasonably have continued even after the percipient witnesses completed their

Having disposed of Cabral-Varela's challenges to what he portrays as the factual underpinnings the MAC's decision, the Court proceeds to consider his claim through the lens of § 2254(d)(1). The problem Cabral-Varela confronts in this regard is the absence of a decision by the Supreme Court identifying the standard that governs a Sixth Amendment challenge to the partial closure of a criminal trial. As the First Circuit has noted, both Waller and Presley v. Georgia, 558 U.S. 209 (2010), "involved total courtroom closure situations where all members of the public were excluded during some phase of the trial." Bucci v. United States, 662 F.3d 18, 23 (1st Cir. 2011). Various Courts of Appeals, including the First Circuit, have applied a slightly modified version of the four-factor Waller test to partial closures, e.g., Bucci, 662 F.3d at 26,[8] but the Supreme Court has not yet endorsed that approach.[9] As two Courts of Appeals have explained, the absence of such an endorsement is fatal to a habeas petitioner's ability to satisfy the § 2254(d)(1) standard when challenging the partial closure of a state criminal trial.

---

testimony. The record makes clear that the prosecutor's plans regarding which civilian witnesses to call evolved throughout the trial, that several civilians identified as (reluctant) Commonwealth witnesses were contemplated and then ultimately not called by the prosecutor, and that the Court might reasonably have anticipated the possibility that Cabral-Varela would call one or more civilians (to recant their earlier statements or to testify favorably to him) in his defense. In addition, law enforcement witnesses, including the final witness of the trial, described interactions with various civilians in the course of investigating the crimes.

[8] The four Waller factors, which must be satisfied in order to justify a complete closure without violating the Sixth Amendment, are: that "the party seeking to close the hearing must advance an overriding interest that is likely to be prejudiced," that "the closure must be no broader than necessary to protect that interest," that "the trial court must consider reasonable alternatives to closing the proceeding," and that the trial court "must make findings adequate to support the closure." 467 U.S. at 48. The modification lower courts have adopted when considering partial closures alters only the language of the first factor, requiring a "substantial interest" rather than an "overriding interest." Bucci, 662 F.3d at 26.

[9] Cabral-Varela acknowledged as much when he petitioned for certiorari on direct appeal. See Doc. No. 17 at 238-39, 249-55 (describing a "lack of jurisprudence on the Waller standard," urging the Supreme Court to provide "much-needed guidance," and suggesting lower courts "operate without any guideposts at all," especially insofar as the breadth of closures are concerned in cases involving witness intimidation concerns).

Drummond v. Houk, 797 F.3d 400, 404 (6th Cir. 2015); Garcia v. Bertsch, 470 F.3d 748, (8th Cir. 2006).[10]

In vehemently arguing to the contrary, Cabral-Varela misunderstands Presley as having addressed a partial closure (it did not), compare Doc. No. 24 at 2, with Presley, 558 U.S. at 210, and Bucci, 662 F.3d at 23, and urges that unanimity among lower federal courts as to the standard applicable to partial closures creates clearly established federal law for habeas purposes (it cannot), compare Doc. No. 24 at 3-4, with Frost, 574 U.S. at 24, and Woodall, 572 U.S. at 425-26. He also relies on mischaracterizations of decisions by other Courts of Appeals which, in reality, directly undermine his habeas claim. See note 10, supra.

In this case, the record establishes that the trial court was intently focused on balancing the need to prevent witness intimidation and disruptions of the trial against the constitutional guarantee of a public trial.[11]  The state courts acted reasonably in applying a modified version of

---

[10] As the respondent points out in his surreply, Cabral-Varela miscited Drummond as a decision of the Eighth Circuit, wrongly suggesting it evidenced a retreat from that Circuit's holding in Garcia.  See Doc. No. 24 at 2-3; Doc. No. 27 at 1-2. Cabral-Varela compounded his mischaracterization of Drummond by citing only the earlier of two panel decisions considering the relevant habeas challenge. Doc. No. 24 at 2-3. In fact, the panel decision upon which Cabral-Varela relies was vacated by the Supreme Court and remanded in light of Woodall and its guidance regarding the limitations of § 2254(d)(1)'s "unreasonable application" standard. 797 F.3d at 401-02. On remand, the Sixth Circuit echoed the Eighth Circuit's earlier determination that Waller's four-part test applicable to full courtroom closures does not supply clearly established federal law as to partial closures and denied habeas relief. Id. at 403-04.

[11] At the outset of the trial, the judge discussed with counsel the fact that Cabral-Varela's young daughter would not be permitted in the courtroom but sought to ensure that this prohibition would not result in the exclusion of Cabral-Varela's girlfriend (the child's mother). Doc. No. 17-1 at 49-50 ("I was concerned that we were perhaps excluding someone. I can't have a very young child in here making noise as was happening earlier."). This was not the only moment during the trial when the judge endeavored to balance the need to maintain public access to the trial with his obligation to protect the orderliness of the proceedings. See also id. at 44 (emphasizing that despite implementation of the requested check-in procedure, the judge did "not intend either a partial or complete closure of the courtroom at any time during the trial," and that such a step would be taken "only upon a further ruling based on adequate cause"); Doc. No. 17-5 at 12-16 (denying prosecutor's request to exclude a spectator based on a social media post

the Waller test and finding it was satisfied in the specific circumstances of Cabral-Varela's trial. That another judge might possibly have responded differently to Mendes's comments in the moment—by, for example, excluding him only during civilian witness testimony, or by inquiring further as to the individuals to whom he was speaking at the time of the comments and/or the individuals who congregated next to a witness's home that night—does not render Cabral-Varela's claim meritorious.  There are reasonable arguments to be made that the Waller standard applies differently when considering a partial closure.  See Drummond, 797 F.3d at 403 (noting that, besides modifying the language of the identified factors, courts might also assess the stated factors differently given that they include "vague" and "elastic" terms which might lend themselves to "a somewhat looser cut" in the partial-closure context); cf. Bucci, 662 F.2d at 27 n.5 (listing cases in which federal courts have concluded that alleged closures were too trivial to implicate the Sixth Amendments, including some involving the exclusion of a single person from part of a trial).  The existence of such arguments, allowing for the possibility of fairminded disagreement, is fatal to Cabral-Varela's petition, especially where his challenge takes aim at a highly context-dependent determination made by a trial judge while immersed in the relevant circumstances.

In sum, the Sixth Circuit's reasoning in Drummond applies with equal force here:

> The only principle from Waller that was clearly established for purposes of the partial closure here was the general one that the trial court must balance the interests favoring closure against those opposing it.  The [Massachusetts] courts applied that principle; and they did so reasonably, in the capacious sense of 'reasonable' as used for purposes of the habeas statute.  The [MAC]'s application of Waller to [Cabral-Varela]'s case therefore was not unreasonable within the meaning of the habeas statute, which means that he is not entitled to relief . . . .

797 F.3d at 404.

---

referencing the trial); id. at 54-55 (lifting sequestration order and permitting Cabral-Varela's girlfriend to enter as a spectator after the prosecutor indicated he would not call her as a witness).

IV.    <u>CONCLUSION</u>

For the foregoing reasons, Cabral-Varela's habeas petition is DENIED.[12]

SO ORDERED.

 /s/ Leo T. Sorokin
United States District Judge

---

[12] As "reasonable jurists" could not "debate whether . . . the petition should have been resolved in a different manner," <u>Slack v. McDaniel</u>, 529 U.S. 473, 484 (2000), no certificate of appealability shall issue.  As explained fully above, the MAC's determinations of fact and application of clearly established federal law were reasonable and are entitled to this Court's deference.  No decision of the Supreme Court squarely addresses the partial closure of a courtroom, let alone dictates a different analysis or result than the one reached by the MAC here.